UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

IN THE MATTER OF THE SEARCH OF
DNA

Case No.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Keith Warzecha, currently assigned as a Special Agent with the Drug Enforcement

Administration, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I am employed as a Special Agent with the Drug Enforcement Administration

(DEA), Hartford District Office, and have been so since August 2010.  I have been employed

with the DEA as a Special Agent since 1996, and until August 2010, I was assigned to the Little

Rock (Arkansas) District Office and have been so since August 2010.  I am an investigative or

law enforcement officer of the United States within the meaning of Title 18, United States Code,

Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests

for offenses enumerated in Title 18, United States Code, Section 2516, offenses set forth in Title

21, United States Code and other federal felony offenses.  I am also a federal law enforcement

officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a

government agent engaged in enforcing the criminal laws and duly authorized by the Attorney

General to request a search warrant.

2.      During the course of my career with the DEA, I have participated in numerous

criminal investigations, including many investigations into suspected narcotics trafficking,

money laundering and violations of firearms laws.  My participation in these investigations has

included:  coordinating controlled purchases of narcotics utilizing confidential informants,

cooperating witnesses, and undercover law enforcement officers; coordinating the execution of

search and arrest warrants, many of which have resulted in the seizure of narcotics, firearms and drug paraphernalia used in narcotics distribution; conducting electronic and physical surveillance, including participation in the conduct of wiretap investigations; analyzing records related to narcotics trafficking; testifying in court proceedings; and interviewing informants and cooperating witnesses, many of whom are involved in drug distribution activity, and other members of law enforcement regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport, and distribute controlled substances.  I have participated in several investigations involving the use of court-authorized interception of wire and electronic communications.  I have also received instruction relative to conducting drug investigations while attending the DEA Academy in Quantico, Virginia.  In addition, I receive periodic in-service training relative to conducting drug investigations.  In the course of my duties as a DEA Special Agent, I have prepared affidavits in support of applications for search warrants and arrest warrants and have executed numerous search and arrest warrants.

3.     As a result of my training and experience, I am familiar with the slang and coded conversation employed in the narcotics trade, and I know the wholesale and retail value and pricing associated with various controlled substances, including heroin, cocaine, cocaine base, and marijuana, and the manner in which these controlled substances are commonly packaged for wholesale and retail, i.e. "street-level," distribution. I know that the State of Connecticut is generally viewed as a consumer state in regards to narcotic activity.  It is common for drug traffickers to travel to major distribution centers such as New York, Massachusetts, or Florida to purchase their narcotics for distribution. After purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. Drug traffickers' methods include, but are not limited to, the use

of shipping companies, such as UPS or FedEx, commercial airlines, private motor vehicles, tractor-trailer units, public transportation, motor vehicles with concealed compartments, and government and contract mail carriers.

4.     I am familiar with the manner and means employed by narcotics traffickers, including the manner and means by which narcotics traffickers communicate, as well as the devices commonly utilized by them, and those methods employed by narcotics traffickers in an effort to avoid detection by law enforcement. I know that narcotics traffickers often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones and sometimes re-activate a cellular telephone that has not been used for a period. I also know that narcotics traffickers sometimes use cellular telephones subscribed to by other persons and pre-paid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate and utilize, which is done in an effort to avoid detection and thwart the efforts of law enforcement.

5.     As indicated above, I have investigated and participated in numerous operations that involved drug trafficking violations. Search warrants relating to these investigations have covered vehicles utilized by drug traffickers and their coconspirators, residences of drug traffickers and their coconspirators, premises and residences used by narcotics traffickers as "mills," where drugs are processed and packaged for re-distribution, "stash houses" used as storage locations for controlled substances, locations used as points of distribution for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to

legitimize their unlawful drug trafficking. Based on my training, experience, and participation in this and other drug trafficking investigations, I also know that:

a.  drug traffickers commonly conceal within their residences, controlled substances, diluents, drug paraphernalia, including packaging and processing materials, cash proceeds and items of value derived from drug trafficking, wireless telephones used in furtherance of drug trafficking, firearms, financial records and documents relating to the distribution of controlled substances, including ledgers, and records and documents concerning transactions relating to transferring, storing, secreting, and spending money derived from drug trafficking, including receipts;

b.  drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement, including placing assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

c.  even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.  drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashiers' checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

e.  persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily

movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

f.   drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug businesses;

g.   drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashiers' checks, money orders, telephones and tablets with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

h.   drug traffickers commonly provide narcotics on consignment to their customers, who subsequently pay for the drugs after reselling the drugs, and thus, the above mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

i.   it is a common practice for drug traffickers to store their drug proceeds, drug inventory, diluents, and drug related paraphernalia in their residences, outbuilding, garages, or cars, or in the residences, outbuilding, garages, or cars

of their trusted associates, including within safes or lock-boxes or other closed
containers;

j.  when controlled substances (including but not limited to heroin, cocaine, and
cocaine base) are stored within a premises or an automobile, residue of the
controlled substance can remain in the storage location for months after the
drugs themselves have been removed, can be detected by a narcotics canine,
and there exists a process pursuant to which investigators can collect as
evidence residue of suspected controlled substances, and the residue can be
laboratory tested to confirm, or rule out, the presence of a controlled substance
in the residue;

k.  drug traffickers often have photographs, slides, or videos of themselves, their
co-conspirators and the property and assets purchased with drug proceeds.
These photographs and videos are normally in the drug trafficker's possession
or residence, and are often stored electronically such as on a cellular telephone
or tablet;

l.  drug traffickers commonly have firearms and other weapons in their
possession, in their cars, on their person, at their residence including, but not
limited to, handguns, rifles, shotguns,  automatic weapons, and knives, which
are most often kept to protect and secure traffickers' drugs, drug proceeds, and
property.

**REQUESTED WARRANT**

6.      I submit this affidavit in support of a search and seizure warrant for two buccal
DNA swab samples from ANTHONY WHYTE DOB (xx-xx-1974). WHYTE is currently
detained pretrial at the Donald W. Wyatt Detention Facility (Wyatt) in Central Falls, Rhode

Island. As discussed below, I believe such DNA swab samples may evidence WHYTE's possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c).

7.     As part of my duties, I am conducting an investigation, together with other law enforcement officers, into suspected criminal activity, including drug trafficking and money laundering, by ANTHONY WHYTE, a.k.a. "Jak Mac;"  AMY SARCIA; and others, including others yet unknown or not yet fully identified. Based upon information known to me as a result of my participation in this investigation, as well as information, which I have determined to be accurate and reliable, provided to me by other law enforcement officers, including my co-case agents in this investigation, I am familiar with the information discussed herein. Where the contents of documents, or communications with others, are reported herein, they are set forth in substance and part, unless otherwise indicated.

## PROBABLE CAUSE

8.     On February 21, 2019, law enforcement arrested Anthony WHYTE, Amy SARCIA, and eleven other individuals pursuant to criminal complaints. Docket No. 3:19cr64(VAB),[1] Doc. 1. The grand jury subsequently returned an indictment [Doc. 29], a superseding indictment [Doc. 442], and a second superseding indictment [Doc. 704], charging a total of twenty-six defendants as part of the narcotics conspiracy. Currently, five defendants (including WHYTE and SARCIA) remain scheduled for trial.[2] The charges stem from a multi-

---

[1] Unless otherwise indicated, all citations to the docket are for this case number.

[2] Whyte is charged with conspiracy to distribute and possess with the intent to distribute 5 kilograms or more of cocaine, 100 grams or more of heroin, 40 grams or more of fentanyl (Count One); possession with the intent to distribute heroin (Counts Two, Three, and Four); possession with the intent to distribute 500 grams or more of cocaine and 40 grams or more of fentanyl (Count Eight); possession of a firearm in

month wiretap investigation targeting a drug trafficking organization (DTO) lead by WHYTE. Doc. 179.

9.      Contemporaneous to the arrests, law enforcement executed search warrants on February 21, 2019 for several locations believed to be connected to the DTO, including Whyte's residence (Unit #14). Incident to the search of Unit #14 Agent seized approximately 51 gross grams of marijuana, the two cellphones intercepted during the investigation, approximately $10,017.00 in United States currency, and a key to another unit in the complex, Unit#10.[3] Agents also searched Unit #13, an apartment utilized by Whyte to store and seized approximately 36.8 gross grams of blue suspected fentanyl pills, 82.5 gross grams cocaine, 43 gross grams heroin, 45.9 gross grams suspected Oxycodone pills, 361.4 gross grams suspected THC oil, 48.5 gross grams cocaine, and evidence of narcotics distribution including a digital scale, heat sealed bags with residue and two cellphones. From the search of Unit #6, S.J.'s apartment, agents recovered 116 gross grams marijuana.

10.     Law enforcement also entered a particular unit within the apartment complex, Unit #10, by way of consent from the apartment manager, SARCIA, who is also charged in the instant matter.[4] Officers located an apartment door in a location consistent with SARCIA's

---

furtherance of a drug trafficking crime (Count Nine); and conspiracy to launder monetary instruments (Count Thirteen). Doc. 704. Jury selection in this matter is presently set for May 3, 2021. [Doc. 1459].

[3] As discussed below, law enforcement gained consent to enter Unit #10 and determined it to be, yet another apartment WHYTE utilized to stash narcotics.

[4] At the time of her arrest, SARCIA gave a post-Miranda statement in which she stated that there was an empty apartment unit in her apartment building, identified by SARCIA as Unit #10, to which she and WHYTE have access. SARCIA explained that WHYTE intended to move his items into Unit #10 the next month but had not fully moved into the unit at that time. SARCIA provided written consent to enter the location she identified as Unit #10. At the time SARCIA gave consent, WHYTE was in another unit in the apartment complex, had been placed under arrest, and had informed officers that he declined to make any statements.

description that had the number "0" on the front with a space where the number "1," which would have comprised the "1" in the number "10" was missing. SARCIA also provided a key to Unit #10 and the key which she provided fit the door to the apartment with the number "0" on the front. As noted above, a key seized in Anthony Whyte's apartment (Unit #14) fit the door to the apartment with the number "0" on the front (Unit #10).

11.     Within Unit #10, officers located a small amount of suspect cocaine base and evidence of narcotics packing and distribution such as baggies, cutting agent, and five digital scales. Officers also located articles of men's clothing. The apartment also contained other items of residency including dirty pots/pans, vitamins and supplements, a yoga mat, women's athletic shoes, two lifting weights, woman's clothing, female toiletries, a used towel, a laundry basket, sheets, an ironing board, computer monitor and printer cartridge. Officers also located a large safe. Two narcotics detection canines have alerted to the presence of narcotics within the safe. Both of the detention canines have been trained to detect controlled substances and were up to date on their certifications. SARCIA denied any knowledge regarding the safe.

12.     After obtaining a warrant to open the safe, law enforcement recovered ten firearms, magazines, and ammunition from the safe. Also inside the safe was a "Love Pink" brand handbag.[5] Along with the firearm related evidence, law enforcement also seized large quantities of narcotics from the safe, including over 500 grams of cocaine and over 400 grams of a substance containing a detectable amount of fentanyl. Following their seizure on February 21, 2019, law enforcement swabbed several items to be tested for the presence of DNA, including the ten firearms, ammunition, and magazines as well as a bag containing one of the firearms and the Love Pink bag.

---

[5] The bag is not pink. It is black and white.

13.     Based on the evidence acquired to date, law enforcement believe WHYTE and SARCIA may have handled the items within Unit #10, including the firearms and other evidence recovered from the safe and the Love Pink handbag found within the safe.

14.     As discussed below, lawfully intercepted communications, surveillance, and other information evidence that WHYTE, SARCIA, and others violated federal law. In terms of organizational structure, WHYTE is a heroin/fentanyl and cocaine source of supply for SARCIA, Royshawn ALLGOOD and other DTO members. WHYTE obtained cocaine from multiple sources, including a source from New York. He utilized other DTO members to transport the cocaine back to Connecticut. WHYTE obtained heroin/fentanyl from another source located in Connecticut. WHYTE has also travelled to Miami, Florida, multiple times to arrange and facilitate the shipment of kilogram quantities of cocaine from another source to Connecticut. WHYTE worked closely with Ramel GENERAL, who distributed narcotics for WHYTE, including in WHYTE's absence. SARCIA managed the apartment complex where WHYTE lived, distributed narcotics, and stashed narcotics. She also owns and operates Two Wives Pizza, a business located in the same complex as the apartment building. SARCIA utilized Two Wives to launder narcotics proceeds for WHYTE. She distributed marijuana and marijuana cartridges. WHYTE utilized his residence in the apartment complex managed by SARCIA, Unit #14, to sell narcotics as well as at least additional apartments in the apartment complex (Unit #13, Unit #6, and Unit #10) to store narcotics, package narcotics, and store narcotics proceeds. The apartment building is a white Stucco/Masonry three floor building that contains apartments and businesses, Washington Street Coffee House and Two Wives Pizza. Washington Street Coffee House is a coffee shop located at the front of the Washington Street side of the building and Two Wives Pizza is a restaurant located at the rear of the Washington Street with an address of on

10

Huntington Street. The apartment complex is three floors and is listed as containing 28 apartments. Unit #14 and Unit #13 are on the ground floor. Unit #6 is located on the second floor of the building. Unit #10 is located on the third floor of the building. Information from Eversource utility company establishes that WHYTE pays the utilities for apartment unit #14. SARCIA's business, EED LLC, pays the utilities for unit #13. S.J. pays the utilities for unit #6. The utilities for Unit #10 were not in anyone name following January 1, 2019.[6]

15.     We intercepted multiple communications evidencing SARCIA's involvement in the DTO by allowing WHYTE and his narcotics runners to utilize multiple apartments in the complex where WHYTE resides that she managed. For instance, on January 28, 2019, at 17:38 EST in session 10798 intercepted over a phone held by WHYTE and identified in the investigation as "Target Telephone-3," WHYTE spoke to SARCIA. During the call, the following conversation occurred:

> AW: Hello.
> AS: Hi there.
> AW: Hey.
> AS: [Coughs] Sorry I didn't mean to cough in your ear. Um, when are you coming back?
> AW: Tomorrow. Tomorrow night.
> AS: Okay. Is your apartment in a position that I can show it to somebody who wants to rent
> AW: Um, the down. Um, the old GA's?
> AS: The. Your apartment. The number fourteen. Where you currently reside. [Voices Overlap].
> AW: I'm not leaving. [Clears throat]. I'm not leaving number fourteen.
> AS: I thought you were. [Voices Overlap].
> AW: I'm leaving the. No. The GA, the. The thirteen, that's the one I wanna leave.
> AS: Oh. That's the only one you wanna leave? [Voices Overlap]. You wanna keep fourteen and take upstairs?
> AW: Yeah. Yeah. [Voices Overlap]. Like I was doing before, I just wanna switch from thirteen to upstairs.
> AS: Oh, okay. Got you. Okay. Okay. Okay. Oh, alright good. I'm glad I'm clear about that. so what about the studio? What condition is that in?

---

[6] Prior to January 1, 2019, the utilities previously were in the name of an individual referred to herein as M.K., believed to be the prior renter of the unit.

AW: That's. I mean, they could see it. Just, um, let me um, make sure ain't nothing around. know what I mean? [Voices Overlap]. Let me call Rah and make sure and then [UI] they can see that.

AS: Yeah. Well is it a mess in there? Like, what's? Like GA still has his shit in there?

AW: He still got his stuff, but we. I put it like to the side, packed it to the side. [Voices Overlap]. is [stamerring], they can see. It's decent, they'll see it. It's clean.

AS: Oh okay. Okay so, tomorrow around five o'clock, I wanna show it. [Voices Overlap]. if you wanna talk to Ra and just let him know that before then he should make sure it looks in good condition.

AW: Alright. Alright, I got you.

AS: Alright, cool.

AW: Alright.

AS: Alright. I'll talk to you later.

16.     Based on my training and experience, I believe that in the conversation set forth above, SARCIA contacted WHYTE, who was in Florida at the time of the call arranging the shipment of narcotics to Connecticut, to inquire about the status of one of her apartments he utilizes and whether it was in a condition to be shown to a potential tenant ("Is your apartment in a position that I can show it to somebody who wants to rent"). The need for further clarification as to which apartment SARCIA referred evidences that WHYTE utilizes multiple apartments in her building. WHYTE sought additional clarification before he could answer SARCIA's inquiry as to whether the apartment could be shown to a potential tenant.

17.     First WHYTE asked if she meant an apartment on the lower level, (believed to be Unit #13) a unit that had been utilized by J.G., a.k.a. "GA," an uncharged member of the DTO ("Um, the down. Um, the old GA's"). After SARCIA clarified that she was asking about the current apartment in which WHYTE resides (Unit #14) ("Your apartment. The number fourteen. Where you currently reside"), WHYTE explained that he was not planning to vacate Unit #14 ("I'm not leaving number fourteen").

18.     In addition, WHYTE asserted that it was his intention to relinquish control of another downstairs unit, Unit #13, previously utilized by one of his drug runners, J.G., a.k.a.

"Ga." ("The thirteen, that's the one I wanna leave"). As noted above, Unit #14, and Unit #13 are both on the ground level of the apartment building. This exchange also evidences both WHYTE's use of multiples apartment in the building and SARCIA's knowledge concerning such usage.

19.     SARCIA, however, expressed her confusion that WHYTE wanted to vacate only one apartment, evidencing that he was utilizing more than Unit #13 and Unit #14 ("that's the only one you wanna leave"). She then asked if he wanted to continue his use of Unit #14 and replace his use of Unit #13 with an apartment upstairs ("you wanna keep fourteen and take upstairs"), referring to Unit #10. WHYTE responded in the affirmative and clarified that he wanted to use apartments on multiple levels of the complex as he had done in the past ("like I was doing before"). As noted above Unit #10 is on an upper floor of the building while Unit #14 and Unit #13 are on the ground floor of the building.

20.     SARCIA then inquired about the condition of the "studio," asking if "GA still has his shit in there." Based on the reference by both SARCIA and WHYTE as the second downstairs unit being used by "GA," an alias for J.G., the studio is believed to be another reference to Unit #13 Thus, SARCIA returned to her inquiry as to whether the apartment WHYTE wanted to vacate (originally believed by SARCIA to be Unit #14, and clarified by WHYTE to be Unit #13, had been cleared of all contraband before showing Unit #13 to a potential tenant. WHYTE promised that another coconspirator, GENERAL, a.k.a. "Ra," would ensure that the apartment SARCIA could show the potential tenant was "clean."

21.     Notwithstanding, WHYTE's expressed intent to vacate Unit #13 and SARCIA's inquiry with WHYTE about showing Unit #13 to a tenant as discussed above in session 10798 intercepted on January 28, 2019, subsequently intercepted communications evidence WHYTE's

intention to maintain possession of several apartments including Unit #14, Unit #10, and Unit #13.

22.     On January 30, 2019, SARCIA and WHYTE had a text message conversation that was intercepted over Target Telephone-3 during which the following exchange occurred:

> AS: I've been in and out of the apartment upstairs by the way (session 11046, received at 12:04 EST)
> AS: I started cleaning the bathroom so I can take a bath up there. Also just needed a space to get away now that I don't have my apartment downstairs (session 11047, received at 12:04 EST)
> AW: Ok (session 11048, sent at 12:05 EST)

23.     Based on my training and experience, I believe that the text message conversation set forth above, SARCIA informed WHYTE that she had been using one of his apartments for personal space ("just needed a space to get away now") and that the apartment was upstairs. As WHYTE's residence, Unit #14, is downstairs, I believe that this exchange evidences not only that WHYTE is utilizing multiple apartments in SARCIA's complex, but that she felt WHYTE needed to be informed of her entry and use of one of the apartments, evidencing his possession and control of an upstairs unit, Unit #10. Indeed, during the consent search of Unit #10, law enforcement noted multiple items indicating that someone or multiple individuals had access to the unit, including items of residency such as dirty pots/pans, vitamins and supplements, a yoga mat, women's athletic shoes, two lifting weights, woman's clothing, female toiletries, a used towel, a laundry basket, sheets, an ironing board, computer monitor and printer cartridge.

24.     On February 1, 2019, WHYTE sent a text message to SARCIA at 13:30 EST intercepted in session 11423 over Target Telephone-3 that stated, "Doing my rent and paycheck today I want us for this go half upstairs and I'll pay my half and other apartment before 9th is that good."

25.     Based on my training and experience, I believe that WHYTE's statement that he

was "doing my rent and paycheck today," evidence that WHYTE intended to pay cash (narcotics

proceeds) to SARCIA for both his rent and the paycheck of laundered funds. SARCIA and

WHYTE then engaged in a further conversation via text messages on February 1, 2019, that was

intercepted over Target Telephone-3 during which the following exchange occurred:

> AS: if it works then we keep as is (session 11425, received at 13:30 EST)
> AW: I'm not sure I can do that. I already pay for part of Stephanie's apartment
> (session 11426, sent at 13:32 EST)
> AS: You can just pay me for half of January as prorated rent for the new tenant
> moving in (session 11427, received at 13:32 EST)
> AW: I am keeping all them (session 11428, sent at 13:33 EST)

26.     Based on my training and experience, I believe that in the above exchange,

SARCIA and WHYTE discussed his payments to her for multiple apartments, including an

apartment for which he pays a portion of the rent that is occupied by "Stephanie," believed to

refer to S.J. who resides in Unit #6. WHYTE also expressed his intention to maintain control of

multiple apartments (Unit #14, Unit #13, Unit #10, and Unit #6), stating, "Iam keeping all them."

Communications such as the exchange in the text message conversation set forth above is

consistent with other intercepted communications evidencing WHYTE's refusal to relinquish

any of the multiple units he is using evidences his need for more than one apartment to operate as

a stash location for narcotics and narcotics proceeds.

27.     We also intercepted communications evidencing that other coconspirators, such as

GENERAL, have obtained access to Unit #13 via SARCIA when WHYTE is not present. On

January 8, 2019, at 12:30 EST in session 8940 intercepted over Target Telephone-3, WHYTE

spoke to GENERAL. During the call, the following conversation occurred:

> AW: Hello.
> RG: Yo!
> AW: Yeah.

RG: I just did the crazy fuck shit, man.
AW: What?
RG: I don't fuck around and locked the fucking keys in the crib.
AW: On the other side?
RG: U/I, man.
AW: Oh.
RG: And Amy not even fucking here and I don't think this nigga even got a key.
AW: Yeah, nobody got a key for there.
RG: I know. [Whispers] Oh my God! I gotta try and do it with this card and shit but I don't want nobody seeing me. [Sighs]
AW: In that one there? Difficult! And you got that... I don't know if with the card or what you ain't... That one there is difficult.
RG: Fuck, man! I just U/I up those stairs to see... I don't even know why I walked U/I, I know that nigga ain't got one.
AW: Yeah, Taylor don't got that...The only per.
RG: It's Amy. I remember we made sure of that.
AW: Yeah.
RG: But I think she's... I don't even think she ever put that shit with her key ring. I think that shit is in her office but I don't think nobody can get in her office.
AW: Oh. No, they have keys. They... No, they got keys to her office.
RG: Well, I think that one is in her office. I'm 'bout to ask him cause... but I don't think nobody here cause it's only Jay in there... [Voices Overlap]
AW: Yeah but... And that's the thing, I don't... I ain't want nobody... You know what I mean?
RG: Yeah. No, no, no. I don't want nobody knowing that shit either. That's why I ain't even talking about. As far as she think, she think... it's your crib too, nigga. she don't think U/I. You know what I mean?
AW: Huh-hum.
RG: Fuck! I'ma try this card. U/I. [Background: Noise]
AW: Alright. Let me know if you get in there.
RG: Alright.

28.     Based on my training and experience, I believe that in the above conversation,

GENERAL contacted WHYTE after GENERAL accidentally locked his keys inside Unit #13 ("I

don't fuck around and locked the fucking keys in the crib"). WHYTE's confirmation that

GENERAL was referring to the unit on "the other side" is consistent with the location of Unit

#13, which is directly across from Unit #14.

29.     I also believe that WHYTE's assertion, "yeah, nobody got a key for there"

followed by "Yeah, Taylor don't got that...The only per" and GENERAL's reply, "It's Amy. I

remember we made sure of that," evidences that SARCIA and WHYTE restrict access to Unit #13 and that GENERAL would need to obtain a key from SARCIA ("Amy").

30.     At 12:43 EST in session 8943 intercepted over Target Telephone-3, WHYTE and GENERAL spoke again with the following conversation occurring:

> RG: Yeah, I'm good.
> AW: Oh, alright.
> RG: Yeah, cause her mother fucker O... She not here, but the office door is open for Jenny. So I'm like; "Yo, man. I need a key. I got a key, you know I mean, in his crib. I left my house keys, car keys everything in his crib." She's like... I'm like; "Your office door open." She's like; "Well tell Jenny to go give you uh..., HN  key." I'm like; "Yup! That shit sure did work."
> AW: Oh, so she had what, HN key in there?
> RG: Yup!
> AW: Oh, okay.
> RG: I'm bringing it back to her right now.
> AW: Alright.
> RG: Alright.

31.     Based on my training and experience, I believe that in the conversation set forth above, GENERAL contacted WHYTE to let WHYTE know that he had contacted SARCIA and obtained access Unit #13 via a key from a third party identified as "Jenny," who was in SARCIA's office.

32.     From SARCIA's cell phone, law enforcement extracted text messages and other evidence pertaining to her distribution of controlled substances, primarily marijuana, and her awareness of drug trafficking by others within the apartment complex, including WHYTE. For instance, during a text message exchange on October 28, 2018, SARCIA communicated with a customer identified herein as M.S. During the exchange, the following conversation occurred:

> MS: Any cartridges for sale����
> AS: Yep
> MS: Cool Gonna be around this afternoon?
> AS: Yes at 2wives now til ?
> AS: How many do you want?

33.     Based on my training and experience, I believe that in the above conversation, M.S. sought to purchase marijuana cartridges from SARCIA ("Any cartridge for sale") and she agreed, explaining that she could conduct the transaction at her business, Two Wives ("Yes at 2wives not til ?").

34.     On May 23, 2018, SARCIA had a text message conversation with a drug customer identified herein as "D." During the exchange, the following conversation occurred:

> AS: I have two different kinds of hybrids and some indica
> AS: I have one sativa left. Strawberry Cough
> D:  Are they 500 or 1000 and how much pls
> AS: 500 and 40

35.     Based on my training and experience, I believe that in the above conversation, SARCIA told D that she had multiple kinds of marijuana for sale ("hybrids and some indica" "one sativa left") as well as respective prices ("500 and 40").

36.     We also recovered text messages from SARCIA's phone concerning the transport of a large safe, consistent with the large safe located within Unit #10, on WHYTE's behalf to the apartment complex. More specifically, on May 5, 2018, the following exchanges occurred via text message between SARCIA, WHYTE and GENERAL:

> AS: Do you still need the jeep? What are you trying to fit in it?
> AW: A big safe
> AS: It won't fit in your truck?
> AS: Crystal said she would do it.
> AS: Itll fit in her back
> AS: I have a bunch of shit in my jeep
> AS: Yooooooo
> RG: Whats up
> AS: Gonna get safe tomorrow

37.     Based on my training and experience, I believe that in the above conversation, WHYTE asked SARCIA for help moving a "big safe" into his apartment. SARCIA later told GENERAL that she was "gonna get safe tomorrow." I further believe that, notwithstanding her

assertion to the contrary at the time of her arrest in February 2019, SARCIA had knowledge

regarding the large safe located in Unit #10.

38.     We also intercepted numerous communications evidence WHYTE's distribution

of redistribution quantities of narcotics to multiple individuals in the DTO. On November 23,

2018, at 17:05 EST in session 707 intercepted over Target Telephone-3, WHYTE spoke to R.K.

During the call, the following exchange occurred:

> AW: I'm trying to wind this shit down now and leave and go to the crib. And be
> over there shit. You know?
> RK: You need to go back over there man.
> AW: Huh!
> RK: I said you need to so I can go run back over there man.
> AW: I know. You know what I'm saying, but it's just a crazy day for me, because
> it's my daughter's birthday. This thing going on. You know what I mean? It's just-
> It's a crazy day.
> RK: Oh yeah.
> AW: But I'm trying to wind this shit down now and go to the crib and deal with
> that.
> RK: Yeah alright. Try to whenever you have a chance, feel me? Cause I'm ready
> you know what I mean? I have people waiting. But hit me up as soon as possible.
> AW: Alright
> RK: Alright. I think I need gray too.

39.     Based on my training and experience, as well as information gathered to date in

this investigation, I believe that in the above conversation, R.K. requested that WHYTE return to

WHYTE's home ("you need to go back over there man"). R.K. indicated that he wanted to meet

with WHYTE so that he could obtain more narcotics ("I said you need to so I can go run back

over there man"). After WHYTE explained that it had been "a crazy day," R.K. reiterated that he

would be ready to meet when WHYTE returned because he had customers waiting for narcotics

("Try to whenever you have a chance, feel me? Cause I'm ready you known what I mean?  I

have people waiting"). R.K. indicated that he also needed to purchase heroin ("I think I need

gray too").

40.     On February 2, 2019, at approximately 17:26 EST in session 482 intercepted over Target Telephone-7, WHYTE spoke to J.J. During the call, the following conversation occurred:

> AW: Yo.
> JJ: Yo, Imma go grab something to eat and shit.
> AW: Alright.
> JJ: Alright, can you make it, the buck?
> AW: Mm-hmm.
> JJ: Alright.
> AW: Alight.

41.     Based on my training and experience, I believe that in the conversation set forth above, WHYTE and J.J. discussed their intention to conduct a narcotics transaction and that J.J. wanted 100 grams of cocaine ("Alright, can you make it, the buck"). WHYTE agreed to the amount ("Mm-hmm").

42.     On December 28, 2018, at 18:27 EST in session 7396 intercepted over Target Telephone-3 WHYTE received an incoming text message from SARCIA, which stated, "Fuck, that $ you gave me disappeared. So pissed. Dont say anything but if any of my employees come at you with big bank let me know."

43.     Based on my training and experience, I believe that in this text message SARCIA informed WHYTE that the narcotics proceeds he had given her to launder disappeared ("that $ you gave me disappeared") and that she suspected one of her actual employees might have taken the funds, believed to be a large quantity based on SARCIA's description of the proceeds as "big bank." I further believe that SARCIA's assumption that one of her employees took the narcotics proceeds evidences that the proceeds had been left in a location where an employee could discover the cash, either her office or the restaurant.

44.     On March 11, 2021, the Connecticut State Lab returned an analysis report which identified the presence of DNA on the swabs taken from several of items seized on February 21,

2019 including firearms, ammunition, and magazines as well as a bag containing one of the firearms and a "Love Pink" bag.[7]

45.     Accordingly, based on evidence gathered to date including the sampling set forth above, there is probable cause to believe, and I do believe, that WHYTE and SARCIA both had access to Unit #10. Further, notwithstanding her attempt to distance herself from the safe located in Unit #10 that contained the firearms and narcotics, there is sufficient evidence to find that SARCIA not only had knowledge regarding the large safe within Unit #10 (as evidenced by the communications concerning her assistance with moving the large safe into the apartment building), but based on her shared use of Unit #10, her participation in the conspiracy, her knowledge of Whyte's narcotics distribution via the complex, and the recovering of the Love Pink bag from within the safe, there is probable cause to believe and I do believe that she may have handled the items recovered from the safe, including the firearms, ammunition, magazines, and bags, and that her DNA may be on the items. There is also probable cause to believe and I do believe that WHYTE has also handled the items recovered from the safe and that his DNA may be on the items.  Thus, based on the facts asserted herein, I believe there is probable cause to believe that WHYTE's DNA may be a match to some or all of the DNA profiles identified by the lab on evidence described in the March 11, 2021 report and respectfully submit the instant request for a warrant to obtain his DNA.

**EXECUTION**

46.     WHYTE's DNA samples that I am seeking will be collected by buccal swabbing. This method involves taking a sterile swab (similar to a Q-Tip) and gently scrubbing the inside

---

[7] The lab also indicated that it did not detect the presence of DNA on seven of the swabs provided, three of the swabs contained insufficient DNA for analysis, and one of the swabs contained a mixture of DNA that was too complex for analysis.

right cheek, then the inside left cheek, for approximately five to 10 seconds. Two samples are requested in the event that one of the samples becomes contaminated or otherwise cannot be tested. The samples seized will be submitted to the State Lab for examination, testing and analysis, and will be compared to the DNA material obtained from narcotics evidence discussed in the lab report issued on March 11, 2021 discussed herein.

47.     It is understood that DNA profiles or partial DNA profiles of more than one person may be located on an object when more than one person has handled an item.

## CONCLUSION

48.     Based upon the foregoing, there is probable cause to believe, and I do believe, that, obtaining buccal swabbing sample from the inside of WHYTE's mouth for Serology and Deoxyribonucleic Acid analysis may provide evidence of a violation of federal law, including possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c), involvement in a narcotics conspiracy, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1), and 846, and substantive narcotics distribution offenses, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1).

Keith Warzecha
Special Agent

Drug Enforcement Agency

Attested to by the applicant in accordance with the requirements of Fed.
R. Crim. P. 4.1 by telephone.


_____          _____
        *Date*                              *Judge's signature*

_Providence, RI_____          Patricia A. Sullivan, US Magistrate Judge
     *City and State*                     *Printed name and title*